J-A22016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HARALAMBOS GIANNOPOULOS | : | |
| | : | |
| Appellant | : | No. 255 EDA 2024 |

Appeal from the Judgment of Sentence Entered September 21, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0006246-2018

BEFORE:   LAZARUS, P.J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                        **FILED DECEMBER 17, 2025**

Haralambos Giannopoulos ("Giannopoulos") appeals from the judgment of sentence imposed following his convictions for two counts of involuntary deviate sexual intercourse ("IDSI") with a person less than sixteen years of age, one count each of unlawful contact with a minor, indecent assault of a person less than sixteen years of age, and corruption of minors,[1] as well as the trial court's determination that he is a sexually violent predator ("SVP") pursuant to the Pennsylvania Sex Offender Registration and Notification Act ("SORNA").[2]  We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. §§ 3123(a)(7), 6318(a)(1), 3126(a)(8), 6301(a)(1).

[2] **See** 42 Pa.C.S.A. §§ 9799.10-9799.75.  We note that the Legislature has amended SORNA several times.  Relevantly, through Act 10, as amended by Act 29 ("SORNA II"), the Legislature divided sex offenses into two
*(Footnote Continued Next Page)*

We glean the following factual history from the testimony and evidence presented at trial. On the evening of February 17, 2017, twelve-year-old S.B. snuck away from her home in Chichester, Pennsylvania to meet her thirteen-year-old friend, Z.H., under the assumption that they were going to go see a movie. As neither girl was old enough to drive, Z.H. arrived to meet S.B. in a vehicle driven by her thirty-two-year-old cousin, Giannopoulos — an individual S.B. had never met before. When S.B. entered the vehicle, however, Giannopoulos did not drive her and Z.H. to the movies, as planned, but instead took them "for a ride[.]" N.T., 11/15/22, at 52. Giannopoulos believed it was "pretty obvious at the time that [S.B.] was about the same age as" Z.H. N.T., 11/16/22, at 175-76. Approximately "five minutes" into this ride, Z.H. turned the volume up on the radio and remarked that she "really like[d]" the song that was playing, and that she could "twerk to it." N.T., 11/15/22, at 98. When S.B. playfully responded that she could "twerk better than" Z.H., Giannopoulos "reache[d] around" while he was driving, "touched [S.B.'s] thigh[,]" and stated that he'd "like to see that." **Id**.

The ride ultimately "ended up" at Giannopoulos' house in Springfield, Pennsylvania, which he shared with his parents. **Id**. at 52-54, 155-56. After

_____

subchapters: Subchapter H, which applies to sexually violent offenses committed on or after December 20, 2012, **see** 42 Pa.C.S.A. §§ 9799.10-9799.42; and Subchapter I, which applies to an individual who committed a sexually violent offense on or after April 22, 1996, but before December 20, 2012, and whose period of registration or registration requirements under a former sexual offender registration law have not expired, **see** 42 Pa.C.S.A. §§ 9799.51-9799.75. Here, because Giannopoulos committed the underlying offenses in 2017, Subchapter H applies.

exiting the vehicle, Giannopoulos directed both S.B. and Z.H. to a side-entrance to the home that led directly to his room in the basement, all the while instructing them to "be quiet because he didn't want his mom to know [they] were" there. *Id*. "[F]or a good while" after entering the basement, S.B. and Z.H. spent their time "on [their] phones" and "just sitting there." *Id*. at 55. Eventually, Giannopoulos expressed that he was "mad that [they] were on [their] phones[,]" and took S.B.'s phone from her and "put [it] in the drawer." *Id*. at 55, 163. Giannopoulos did not similarly confiscate Z.H.'s phone, as the three instead began "playing [and] messing around[.]" *Id*. at 55.

As the evening went on, and S.B. became increasingly tired, she would often recline on Giannopoulos' bed. Although Z.H. would sometimes join S.B. by "sit[ting] on the end of the bed" throughout the evening, she was otherwise "going in and out of the room a lot." *Id*. On one such occasion when Z.H. had exited the room, Giannopoulos "went and locked the door[,]" returned to sit down on his bed, and told S.B., who was at that point standing nearby, "oh, you can suck my dick." *Id*. at 56. Although S.B. indicated that she did not want to do so, Giannopoulos "pulled his pants down[,] grabbed [her] by the back of [her] head, pulled [her] closer" and made her "suck his penis." *Id*. at 56-57. Afterwards, Giannopoulos told her "over and over again[,]" that they didn't "have to tell [Z.H. about it] if [she] didn't want to." *Id*. at 56. When Z.H. returned to the basement, neither S.B. nor Giannopoulos informed her of the preceding events; instead, S.B. "went into the bathroom" and

indicated to Z.H. that she "was going to cut" herself — an act which Z.H. thereafter talked her out of doing.[3] *Id*. at 58.

Throughout the remainder of the night, the three of them would occasionally rest together on Giannopoulos' bed, with S.B. lying in between Z.H. and Giannopoulos. On one of these occasions, Giannopoulos started "kissing and making out" with S.B., regardless of the fact that Z.H. was right next to them. *Id*. at 130. When Giannopoulos eventually left the room, S.B. informed Z.H. about the kissing and stated that it was "nasty[,]" to which Z.H. simply responded "eww." *Id*. at 130-31. On another such occasion, while S.B. was turned towards and "playing footsies" with Z.H., who was on her phone, Giannopoulos "gripp[ed S.B.'s] legs" with his hands to make her "thrust [against] him[, l]ike a dry hump[,]" so that her "body [was] rubbing up [a]gainst his penis." *Id*. at 59, 130. When Z.H., who was unaware of the events happening right beside her,[4] subsequently left the bed and moved to

_____

[3] We note that in an interview with police following this event, S.B. instead stated that when Giannopoulos "made [her] suck [his penis] for . . . two to five minutes[,]" Z.H. was present to witness the event, that she "covered her mouth and started laughing" in response, and that she began encouraging S.B. by stating "Oh, just do it. Don't be a sis." Exhibit C2, at 8. However, Z.H. testified at trial that: (1) S.B. told her about the oral sex while they were in the bathroom immediately after the incident; and (2) Giannopoulos had previously asked S.B. for "a blow job and . . . anal sex" in her presence, to which S.B. had responded to him that "she did not want to do it . . . because it was disgusting." N.T., 11/15/22, at 165-66.

[4] Again, we note that S.B. stated in an earlier interview with police that Z.H. witnessed this event as well, and that "she kind of just laughed at the whole thing" and "stared at [them] a lot." Exhibit C2, at 10. However, Z.H. testified
*(Footnote Continued Next Page)*

the couch, Giannopoulos "turn[ed] the light off[,] lifted [S.B.'s] butt up in the air[, and] took [her] pants down." *Id*. at 60. After S.B. remained in that position "for a minute" while Giannopoulos "grabbed like lube or something[,] he came back and . . . rubbed [the lube] all in [her] butt [and] all on him, [before] he stuck [his penis] in[to]" her anus. *Id*. at 60. As Giannopoulos proceeded to anally penetrate her, S.B. "was gripping onto the bed[, the sheets,] and the pillows[, and] crying [into the pillows] the entire time[, as she] didn't know what to do." *Id*. at 60-61. S.B. explained that Giannopoulos' "terrible" actions not only "hurt[,]" but that they made her feel as if she "had a piece . . . taken away from [her] that [she could] never get back again." *Id*. at 61. Upon the completion of the act, Giannopoulos whispered in S.B.'s ear once more that they "don't have to say anything to" Z.H. about what just happened, and that "[i]t's okay." *Id*.

S.B. remained with Z.H. and Giannopoulos the rest of the night, during which Giannopoulos again drove them around to various locations, including the mall, as Z.H. explained that Giannopoulos was "rich" and would "buy [them] anything." *Id*. at 62. Notably, while they were in the mall browsing merchandise at the Victora's Secret store, a women's lingerie retailer, Giannopoulos explained that "he's not shopping and buying his little cousin underwear[,] but [that] he would do it for [S.B.] because [she] would look

_____

that although she had witnessed S.B. and Giannopoulos in sexual positions while under the covers in the bed, she claimed she "didn't know what they were doing" until S.B. later told her. N.T., 11/15/22, at 159-60, 165-66.

sexy in it." *Id*. Although Giannopoulos nevertheless purchased underwear for Z.H., he did not purchase anything for S.B., as she did not ask him to do so. The trio then continued to drive around the Philadelphia area, with S.B. and Z.H. stopping to take pictures together, before ultimately returning to Giannopoulos' basement in the early morning hours. Upon their return, S.B. drank from a bottle of alcohol to the extent that it "impair[ed her] ability to remember what happened" the rest of the night. *Id*. at 68. S.B. returned to her home later that same day, whereupon she did not tell her mother what happened, as she did not "think [her mom] would have believed [her, and i]t would have been a whole big fight between [her] family and all that[.]" *Id*. at 70.

A few days later, Giannopoulos, who had made an offer to purchase things for both Z.H. and S.B., picked them up in his vehicle to drive them around once more. After initially driving the girls back to his home, Giannopoulos prompted S.B. to "hav[e] sex again," with the promise that they "don't have to tell" Z.H., as she "could go in the other room[, or they] could do it in the car." *Id*. at 69. When S.B. repeatedly declined Giannopoulos' suggestion, Giannopoulos became "really mad about it" to the extent that he "speed drove [them] all the way [back] to [Z.H.'s] apartment[.]" *Id*. No further communication occurred between S.B. and Giannopoulos following this event.

Approximately five months after the sexual assault, and upon returning home from a two-week commitment at an inpatient mental health facility

pursuant to Section 302 of the Pennsylvania Mental Health Procedures Act,[5] S.B. "couldn't hold it in anymore[,]" screamed at her mother that she "was raped[,]" and disclosed the above events in detail to her mother and grandmother. *Id*. at 71-73. S.B. then reported the incident to police, who conducted separate recorded interviews of S.B. and Z.H.[6]

Following these interviews, police arrested Giannopoulos, seizing his cellphone in the process. Police obtained and executed a search warrant on Giannopoulos' cellphone, which revealed that Giannopoulos made numerous internet searches for pornography pertaining to the forceful anal rape of young, teenage girls. *See generally* Exhibit C15; *see also* N.T., 11/16/22, at 68, 79-88, 113-24. Pertinent examples of these internet searches, as reflected in a web browsing history report ("Web Browsing History Report") prepared by police investigators,[7] are as follows:

_____

[5] *See* 50 P.S. § 7302.

[6] We note that police interviewed S.B. twice, as she initially reported the incident to the Lower Chichester Police Department, who then transferred the case to the Nether Providence Police Department upon discovering the alleged crime had instead occurred within its jurisdiction. Further, the Delaware County Children's Advocacy Center also conducted a forensic interview of S.B. in relation to the incident as well, as "several of her therapists [who] knew about it [also] reported it." N.T., 11/16/22, at 8.

[7] Notably, the Web Browsing History Report consists of ninety-seven pages, reflecting 397 searches made on Giannopoulos' cell phone web browser. As we explain *infra*, the first thirty pages of this report consist of web searches for which no date was recoverable by police investigators due to those web searches having been deleted from the cell phone prior to the search warrant being executed in this matter. Thus, although the search terms could be
*(Footnote Continued Next Page)*

(1) "search.yahoo.com/ . . . forced[ ]anal[ ]crying[;]"

(2) "search.yahoo.com/ . . . fucked[ ]all[ ]holes[ ]forced[;]"

(3) "search.yahoo.com/ . . . russian-teen-cries-while-being-forced-to-fuck[;]"

(4) "search.yahoo.com/ . . . painful[ ]crying[ ]screaming[ ]brutal[ ]wrong[ ]hole[ ]anal[;]"

(5) "search.yahoo.com/ . . . young[ ]teen[ ]forced[ ]anal[ ]porn[;]"

(6) "search.yahoo.com/ . . . girls[ ]gets[ ]fucked[ ]in[ ]both[ ]holes[ f]orcefully[;]"

(7) "www.pornhub.com/video/ . . . search=girl[ ]crying[ ]in[ ]pain[;]"

(8) "nesaporn.com/ . . . anal_creampie_for_teen_girl[;]"

(9) "www.sexhubhd.com/en/ . . . Helpless-European-Te[e]n-Force-Fucked-in-Socks-free[;]"

(10) "www.xvideos.com/video . . . /hard[ ]fuck[ ]in[ ]the[ ]ass[ ]young[ ]girl[ ]on[ ]the[ ]beach[;]"

(11) "www.xvideos.com/video . . . /guys[ ]force[ ]changing[ ]room[ ]to[ ]fuck[ ]asian[ ]teen[ ]full[ ]movie[;]"

(12) "www.xvideos.com/video . . . /anal[ ]pain[ ]cry[ ]for[ ]cute[ ]teen[ ]latina[.]"

_____

recovered following the deletion, the dates of those web searches were not recoverable. Consequently, no dates for web searches were recoverable until approximately six months after the incident in question. The twelve searches provided herein are among the numerous searches included in the Web Browsing History Report for which a date was recoverable by police investigators.

*Id*.  The Commonwealth charged Giannopoulos with two counts each of IDSI and IDSI with a person less than sixteen years of age, as well as one count each of unlawful contact with a minor, indecent assault, indecent assault with a person less than sixteen years of age, and corruption of minors.

In preparation for trial, defense counsel filed an omnibus pretrial motion solely challenging the admissibility of testimony by a Commonwealth expert, and the trial court held a hearing on the motion.  During this hearing, the trial court granted defense counsel's motion.  Immediately following this ruling, however, defense counsel orally requested the court to preclude the admission into evidence of Giannopoulos' cellphone web browsing history.  In doing so, counsel argued that the Commonwealth could not "show for the bulk of the items[:]" (1) "when these websites were accessed or when the searches were made[;]" (2) "what the content of the websites are anyway beyond just a name [or] a URL descriptor[;]" and (3) "whether or not it was" Giannopoulos who conducted the searches at-issue given that "people use each other's devices pretty regularly" to the extent that his ownership of the phone alone "doesn't mean he is the one who made the searches[.]"  N.T., 11/14/22, at 4-5.  The Commonwealth did not provide any argument in opposition to this motion, and the trial court immediately issued the following oral ruling on the matter:

> I have no problem with the admissibility of the web history[,] as we have all agreed, this is [Giannopoulos'] phone.  Regarding the . . . dates and times of which we have no information regarding when it was dated, what time it was.  Any of those web history browsing that is undated and there is no information of when they

- 9 -

were in time will be precluded from testimony. Any web browsing history that was done during the year of 2017 and was recovered and presented to defense counsel in the history of this discovery will be allowed in. The court finds it is relevant under the state of mind, intent exceptions to [the] hearsay rule.

*Id*. at 5 (unnecessary capitalization omitted). Defense counsel did not raise any objection to the court's ruling in this regard.

The following day, Giannopoulos proceeded to a jury trial, during which the Commonwealth presented testimony from S.B., Z.H., S.B.'s mother, the lead detective assigned to investigate the case, Detective Michael Erickson ("Detective Erickson"), and an expert in forensic digital examinations, Detective Christopher Tankelewicz ("Detective Tankelewicz"). Relevantly, in the midst of its direct examination of Detective Erickson, the Commonwealth moved to submit both a stipulation — agreed to by both parties — that "[a]ll communications and data recovered from [Giannopoulos'] cell[]phone are authentic and were recovered using appropriate procedures in the field of digital forensic examinations[,]" as well as the Web Browsing History Report conducted by a "forensic examiner with the criminal investigation division[.]" N.T., 11/16/22, at 58-59, 74. The trial court admitted both documents into evidence, and thus permitted each party to question Detective Erickson about the significance of the cellphone's recovered data and web browsing history.

During the Commonwealth's direct examination of Detective Erickson, he testified that the web browsing data was significant because "some of the internet searches . . . could be viewed as akin to the investigation that [he] was conducting at the time" given that "some of the pornography that was

- 10 -

searched for and viewed was similar in nature to what [S.B.'s] allegation" was, as "[t]hey described the same scene . . . about young girls and rape and anal sex[,]" and they occurred the same "year when this incident occurred[.]" *Id*. at 62-63. Detective Erickson added that there were a "significant" number of these searches "related to sexual assault [and] teen young girls" and that they occurred over the course of "multiple dates . . . within 2017[.]" *Id*. at 79. On cross-examination by defense counsel, Detective Erickson conceded that the search results with accompanying dates occurred "months after the alleged incident[.]" *Id*. at 90.

Both parties additionally questioned Detective Tankelewicz about the contents of Giannopoulos' cellphone. During the Commonwealth's direct examination, Detective Tankelewicz explained that: (1) although the Web Browsing History Report did not contain any dated web browsing history between January 16, 2017, and August 10, 2017,[8] it "doesn't mean [Giannopoulos] wasn't using his internet at that time or searching for URLs[;]" and (2) the relevant search data within the first thirty pages of the Web Browsing History Report lacked dates due to the fact that "the [iP]hone is very efficient in getting rid of deleted data" such that "once that database . . . marks [an item as] set to be deleted[,] some of the information . . . is [then] deleted actually [while] other[ portions] remain . . . in the database for us to recover." *Id*. at 111-12.

_____

[8] We note that this period encompasses one month before, and approximately six months after, the February 17, 2017 incident.

Following the presentation of the Commonwealth's case, Giannopoulos testified in his defense and presented character testimony from his older sister and two longtime friends. Relevantly, Giannopoulos testified that although he spent time with both Z.H. and S.B. on the night in question, he did not sexually assault S.B. in any way, specifically asserting that he never hugged her, kissed her, rubbed his "penis or any part of [his] body up against" her, or "ever put his penis in [her] mouth [or] butt[.]" *Id*. at 157-58, 190, 205. Additionally, as it relates to the recovered web browsing search history, Giannopoulos conceded that he made the above-referenced pornographic searches, as reflected in the Web Browsing History Report. *Id*. at 156-57.

At the conclusion of trial, the jury found Giannopoulos guilty of two counts of IDSI with a person less than sixteen years of age, and one count each of unlawful contact with a minor, indecent assault of a person less than sixteen years of age, and corruption of minors.[9] The trial court deferred sentencing pending the preparation of a presentence investigation report ("PSI"), a psychological and psychosexual evaluation, and an evaluation by a member of the Sexual Offenders Assessment Board ("SOAB").

On September 21, 2023, the trial court conducted an SVP hearing, with each party presenting testimony from an expert in regard to SVP evaluations. Relevantly, the Commonwealth presented the testimony of Kristen Dudley,

_____

[9] Although it appears that the Commonwealth amended its criminal information prior to trial to remove the two general charges of IDSI, our review of the record uncovers no such motion or any order granting such a motion.

Psy.D., ("Dr. Dudley"), the SOAB's assigned SVP evaluator for this case. Dr. Dudley explained that her initial expert report included an opinion that Giannopoulos was not an SVP, as she believed that he did not "display unusual cruelty" and there was "no evidence to suggest [he] is sexually aroused by violence." N.T., 9/21/23, at 34-35. However, Dr. Dudley explained that she prepared an addendum reversing this conclusion due to the fact that she had "received new information[,]" consisting of the Web Browser History Report, which "necessitated [her incorporation of] an addendum and filing a second report." *Id*. at 6.[10]

As it relates to why she needed to reverse her opinion, Dr. Dudley explained that when she reviewed the 397 searches listed within the ninety-seven-page Web Browsing History Report, including those searches that were undated, she identified "139 instances that included search terms or descriptors of anal sex, forced sex, women crying and or helplessness[.]" *Id*. at 27. Based on these entries, Dr. Dudley opined that Giannopoulos' "search for people who are experiencing pain while being forced to have sex" by using such terms indicated that he was aroused by "both physical and psychological humiliation[,] physical pain, [and] physical degradation, which is a component

_____

[10] We note that immediately following Dr. Dudley's reference to Giannopoulos' cellphone search history, as reflected in the Web Browsing History Report, defense counsel objected to its admissibility, arguing that it was "inappropriate for this expert to consider because of its . . . complete unreliability in terms of the timing" of the searches. N.T., 9/21/22, at 9. The trial court noted the objection for the record, but overruled it, reasoning that it was already "dealt with, argued[,]" and admitted at trial. *Id*.

of sexual sadism [—] a [type of] paraphilic disorder." *Id*. at 13. Dr. Dudley elaborated that sexual sadism "is defined . . . as a period of at least six months of recurrent and intense sexual arousal from the physical or psychological suffering of another person as manifested by fantasies, urges[,] or behaviors" where the "individual has [either] acted on these sexual urges with a non-consenting person, or [they] cause clinically significant distress or impairment in social, occupational[,] or other important areas." *Id*. Accordingly, Dr. Dudley "emphasized the non-consenting person [portion of the definition in her report] because the incident/offense includes a [twelve]-year-old child who was not consenting[,] and [had] stated that she did not want to have sex" before Giannopoulos nevertheless forced her to do so. *Id*. at 14. Pertinently, Dr. Dudley specified that sexual sadism "is a lifetime condition . . . that . . . predispose[s] someone [to an] increase[d] likelihood of re[]offending." *Id*. at 19.

Dr. Dudley additionally opined that Giannopoulos met some of the criteria for an "antisocial personality disorder[,]" which she noted was "unusual [as] it is typically one or the other" in terms of "[e]ither paraphilic disorder or antisocial personality disorder[,] or nothing[.]" *Id*. at 17, 19. Dr. Dudley specifically testified that she formed this opinion based on her review of Giannopoulos' "long criminal history dating back to when he was" thirteen, which indicated that "[h]e has consistently failed to follow the norms of society[,] shown disregard for others and the rights of others throughout his life[, and] does not appear to learn from his mistakes." *Id*. at 17, 19. Thus,

Dr. Dudley concluded that because Giannopoulos "suffer[s from] a mental abnormality and personality disorder[, which includes underlying] traits [and] criteria [that] increase his risk of reoffending [in a predatory and sexually violent manner] in the future[,]" he satisfies the statutory SVP criteria. *Id*. at 21.

In contrast, Giannopoulos presented the testimony of Thomas Haworth, Ph.D., ("Dr. Haworth"), a licensed psychologist specializing in clinical and forensic psychology, who testified that Giannopoulos did not meet the SVP criteria, as: (1) the instant offense did not "include a display of unusual cruelty by the individual during the commission of the crime" so as to satisfy a finding that Giannopoulos had a sexual sadism mental abnormality; (2) Giannopoulos' online behavior was not indicative of his "real time behavior[, as online and real time behavior] are distinct entities that have to be understood in their context[;]" (3) his search history is instead "relatively normative" when compared to the search patterns of normal heterosexual men who view pornography; and (4) further evaluation of "emotional . . . and psychiatric components with him . . . ha[d] to be accounted for before we [could] default to" the level of anti-social personality disorder that Dr. Dudley diagnosed. *Id*. at 103-05, 119, 124-25, 130-31, 134-35, 155, 157. At the conclusion of the hearing, the trial court determined that Giannopoulos met the SVP criteria as he "suffers from a mental abnormality [and] personality disorder that makes him likely to engage in predatory sexual offenses[.]" *Id*. at 204.

Immediately following this determination, the trial court proceeded to sentencing, whereupon it imposed an aggregate term of nineteen and one-half to sixty-three and one-half years' imprisonment, followed by a three-year probationary term.[11]  Giannopoulos thereafter filed a timely post-sentence motion, which the trial court denied.  Giannopoulos then filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Giannopoulos raises the following issues for our review:

1. Whether the trial court abused its discretion in admitting the web searches and URLs where it misapplied the law under the state of mind exception?

2. Whether the trial court abused its discretion in admitting the irrelevant and prejudicial web searches and URLs?

3. Whether [Giannopoulos'] conviction was against the weight of the evidence?

4. Whether the evidence was insufficient for the court to make an SVP determination where it relied on inadmissible and irrelevant evidence?

Giannopoulos' Brief at 4 (unnecessary capitalization omitted).[12]

_____

[11] The trial court indicated that it amended the sentencing order to reflect this aggregate term because the original sentencing order contained an incorrect calculation.  *See* Trial Court Opinion, 12/10/24, at 2.

[12] We note with disapproval that Giannopoulos' brief does not conform to our appellate rules of procedure.  Pursuant to Pa.R.A.P. 2116(a), "[t]he statement of the questions involved must state concisely the issues to be resolved . . .."  The rule further provides that "***No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby***."  ***Id***. (emphasis added).  Here, in his statement of questions involved, Giannopoulos raised the above-identified ***four*** issues.  ***See***
*(Footnote Continued Next Page)*

- 16 -

Giannopoulos' first and second issues both concern the admissibility of his cellphone data as evidence at trial. Prior to conducting this review, however, we must first determine whether Giannopoulos preserved these challenges for our review. Generally, "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). To preserve a claim of error related to an evidentiary ruling, a party must not only raise a timely objection, but must also articulate "the specific ground" for the objection "unless it was apparent from the context." Pa.R.E. 103(a)(1)(B). If a timely and specific objection is made, "[a] party complaining, on appeal, of the admission of evidence in the court below will be confined to the specific objection there made." *Commonwealth v. Konias*, 136 A.3d 1014, 1022 (Pa. Super. 2016) (citation omitted). Consequently, where an appellant lodges a general objection at trial but identifies a more specific basis for the objection for the first time on appeal, the latter challenge is waived. *See Commonwealth v. King*, 959 A.2d 405, 419 (Pa. Super. 2008) (holding that a nebulous objection that fails to implicate the grounds later argued on appeal is insufficient to preserve that issue on appeal).

In his first issue, Giannopoulos purports to challenge the trial court's ruling that the Web Browsing History Report was admissible under the state

---

Giannopoulos' Brief at 4. However, in the discussion section of his brief, he identifies *five* issues, and discusses numerous sub-issues, many of which are not identified in the statement of questions involved or fairly suggested thereby. Thus, pursuant to our well-established appellate rules, we decline to address any additional issues that Giannopoulos raised in this regard. *See* Pa.R.A.P. 2116(a).

of mind exception to the rule against hearsay.  *See* Giannopoulos' Brief at 4.[13]

In addressing this issue, we reiterate that defense counsel objected to the admissibility of the Web Browsing History Report on the basis that the Commonwealth could not "show for the bulk of the items[:]" (1) "when these websites were accessed or when the searches were made[;]"[14] (2) "what the content of the websites are anyway beyond just a name [or] a URL descriptor[;]" and (3) "whether or not it was" Giannopoulos who conducted the searches.[15]  N.T., 11/14/22, at 4-5.  Defense counsel did not object to the admission of the Web Browsing History Report on any other basis.

Notably, at no point in the proceedings did defense counsel advance any argument to the trial court that the Web Browsing History Report constituted

---

[13] Once again, we note with disapproval that Giannopoulos' brief does not conform to our appellate rules of procedure.  Pursuant to Pa.R.A.P. 2119(a), "the argument shall be divided into as many parts as there are questions to be argued . . .."  As indicated above, Giannopoulos identified four issues to be argued in his statement of questions involved.  *See* Giannopoulos' Brief at 4. However, in the discussion section of his brief, Giannopoulos divided his argument into five sections, rather than four.  Moreover, in his first argument section, Giannopoulos purports to challenge the authenticity of the Web Browsing History Report.  *See id*. at 14-28.  Notably, this issue was not raised in the statement of questions involved.  Thus, we may not address it.  *See* Pa.R.A.P. 2116(a).  In any event, even if not waived, we would have concluded that the issue lacked merit, as Giannopoulos **stipulated** to the authenticity of the Web Browsing History Report and thereafter **admitted** that he conducted the searches contained therein.  *See* N.T., 11/16/22, at 58-59, 156-58.

[14] As explained above, this particular pretrial objection was resolved by the trial court's ruling that no searches without a recovered search date were admissible, and that no searches with dates beyond 2017 were admissible.

[15] This pretrial objection was resolved by Gianopoulos' admission at trial that he conducted the searches reflected in the Web Browsing History Report.

inadmissible hearsay. Notwithstanding the lack of any objection on this basis, the trial court ruled *sua sponte* that the Web Browsing History Report constituted hearsay, and that the state of mind exception applied to permit the report's admission. Defense counsel made no objection to the trial court's *sua sponte* determination that the report constituted hearsay, let alone the trial court's *sua sponte* ruling that the state of mind exception applied to permit the report's admission. **See** N.T., 11/14/22, at 5.

Instead, for the first time on appeal, Giannopoulos raises a challenge to the trial court's ruling that the Web Browsing History Report was admissible under the state of mind exception to the rule against hearsay. In advancing this argument, Giannopoulos contends that the trial court erred in applying the exception because "the state of mind [exception] only applies to instances where it is used to establish a person's intent going forward and not backward." Giannopoulos' Brief at 30-31. Giannopoulos argues that because the admitted web searches occurred months after the alleged assault, they do not qualify for purposes of the state of mind exception. **See id**. at 35.

In failing to raise this challenge in response to the trial court's *sua sponte* ruling, defense counsel deprived the trial court of any opportunity to consider this argument and to potentially correct the perceived error at the time it was committed. **See Commonwealth v. Edmondson**, 718 A.2d 751, 753 (Pa. 1998) (explaining that the requirement that a defendant make a timely, specific objection "in the trial court [to preserve an issue for appeal] ensures that the trial judge has a chance to correct alleged trial errors and

eliminates the possibility that the appellate court will be required to expend time and energy reviewing points on which no trial ruling has been made"). Rather, defense counsel remained silent following the trial court's *sua sponte* ruling. Thus, as Giannopoulos failed to preserve this issue by raising it in the trial court, it is waived. ***See*** Pa.R.A.P. 302(a); ***see also Edmondson***, 718 A.2d at 753; ***King***, 959 A.2d at 419. Accordingly, his first issue merits no relief.

In his second issue, Giannopoulos purports to challenge the admission of the Web Browsing History Report on the basis that the searches reflected therein were "irrelevant and prejudicial." ***See*** Giannopoulos' Brief at 4. As explained above, defense counsel's objections to the admissibility of the Web Browsing History Report were limited, and the only potentially applicable objection that could apply to this issue is defense counsel's vague assertion that the Commonwealth could not show "what the content of the websites are anyway beyond just a name [or] a URL descriptor." N.T., 11/14/22, at 4-5. Notably, defense counsel did not object to the admission of the Web Browsing History Report on the basis that the web searches were irrelevant or prejudicial.

Here, even generously viewing the objection made by defense counsel regarding the admission of the Web Browsing History Report, he essentially raised an argument that the search terms used did not necessarily reflect the actual content of the corresponding web addresses. On appeal, however, Giannopoulos contends that the graphic search terms bore no relevance to the

sexual assault charges against him and that their admission contravened Pa.R.E. 401, 402, and 403. *See* Giannopoulos' Brief at 43. Giannopoulos points to specific terms in certain of the web searches, including the terms "European," Russian," "Asian," and "Latina," and claims that none of these search terms relate to the sexual assault in question or any description of S.B. *Id*. at 48. Giannopoulos also challenges the relevancy of the web searches on the basis that the searches were made months after the sexual assault in question. *See id*. at 36. Further, Giannopoulos argues that "it is readily apparent that the searches involved adult 'teen' aged women, and not children." *Id*. at 42. Finally, Giannopoulos claims that the probative value of the searches included in the Web Browsing History Report was outweighed by the danger of unfair prejudice, and that it would thus confuse the jury and divert its attention from determining whether the Commonwealth presented credible evidence of the crimes charged. *See id*. at 44.

Here, upon our careful review, we conclude that defense counsel's vague one-sentence objection failed to raise the significantly modified, multi-faceted argument that Giannopoulos presents to this Court on appeal. To be sure, these numerous additional arguments relating to relevancy and prejudice were not presented to the trial court for its initial consideration. Accordingly, Giannopoulos' second issue is waived. *See* Pa.R.A.P. 302(a); *see also Konias*, 136 A.3d at 1022; *King*, 959 A.2d at 419; *Edmondson*, 718 A.2d at 753.

In his third issue, Giannopoulos argues that each of his convictions was against the weight of the evidence. As our Supreme Court has explained:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

*Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa. 2000) (citations and footnote omitted). "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015) (brackets and citation omitted). Thus, in order for a defendant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court." *Id*. at 546 (citation omitted).

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim ***is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence***. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted, emphasis in original).

Giannopoulos argues that each of his convictions was against the weight of the evidence. In doing so, Giannopoulos initially points to his testimony at trial, wherein he "adamantly denied any wrongdoing, . . . stressed that '[he] did not sexually assault [S.B.,]' . . . denied ever putting his penis in her mouth, . . . rubbing his penis against any part of [her] body, . . . having anal [sex] or any sexual relations with her[, or] ever being under the blankets with" her. Giannopoulos' Brief at 57. Although Giannopoulos acknowledges that both S.B.'s and Z.H.'s trial testimony contradicted these assertions, he stresses that this testimony was unreliable, as it "was riddled" with the following inconsistencies: (1) although S.B. testified that she "began to 'dry hump' [Giannopoulos, Z.H.] somehow did not notice this occurrence[;]" (2) while S.B. "testified that what happened on the bed was 'over the covers[,]' . . . [Z.H. instead] stated that [S.B.] and [Giannopoulos] were 'under the covers' and [that] she did not see what happened[;]" (3) although S.B. testified she

had been crying while she was sexually assaulted in the same room as Z.H., Z.H. testified that Giannopoulos "appeared to have his clothes on him[,] that 'it was pretty dark because the lights were dimmed[,' and s]he could not hear any noises or sounds coming from [Giannopoulos] and [S.B.], [including S.B.'s alleged] cry . . . for help[;]" (4) although S.B. stated that Z.H. was not present when Giannopoulos "pulled his pants down and" forced her head towards his penis, S.B. initially "told police . . . that [Z.H.] was present [during the act,] watched [her] perform oral sex[, and had] 'covered her mouth and started laughing[;]'" (5) S.B. "testified at trial that [the] anal rape occurred above the covers in plain view[, y]et [she] also claimed that [Z.H.] was unaware of what happened [even though Z.H.] was in close proximity, and [S.B.] was in pain and crying while this act occurred above the covers[;]" (6) Z.H.'s prior statement to police that S.B. was happy the night of the incident "contradicted her sworn trial testimony that [S.B.] appeared upset[,]" as Z.H. admitted she lied to police at the time due to the fact that "she and [S.B.] were in an argument[;]" (7) although S.B. "alleged that [Z.H.] was already in the bathroom when [she] entered[,]" she had previously "told the police that [Z.H.] came into the bathroom after" she did; (8) S.B. "couldn't remember if she drank [alcohol] before or after the road trip[,] what type of alcohol she consumed, either vodka or red wine[,]" and who specifically consumed alcohol that night; (9) S.B. "revealed for the first time on cross-examination that she and [Giannopoulos] were kissing in front of [Z.H.] prior to her sexual acts[;]"

- 24 -

and (10) "after this painful sexual assault, [S.B.] remained with [Giannopoulos] until the next morning, and she never called the police or anyone for assistance." *Id*. at 58-61.

Giannopoulos specifically avers that Z.H. was not a credible witness due to the fact that her admission at trial, that she lied to police about S.B.'s emotional state, "demonstrate[d her] willingness to lie whenever she desired to do so." *Id*. at 59. In support of this assertion, Giannopoulos points out that Z.H. evidently lied under oath when she testified that "she would not purposefully lie to police[,]" as by Z.H.'s own admission, she claimed to have provided police with an inaccurate statement prior to trial because "'she did not want to tell anyone the whole truth[,]' . . . 'was scared to tell the truth[,]' [and] 'didn't want anyone to get in trouble or be mad at' her" for telling the truth. *Id*. at 59-60 (brackets omitted). Giannopoulos contends that the record therefore establishes that Z.H. was motivated to lie about the incident to "regain her friendship with S.B." and that she thus lied about the assault at trial "so S.B. would not remain mad at her." *Id*. at 60.

Giannopoulos similarly challenges S.B.'s credibility as a witness due to the fact that "after [the alleged] incident, [she] was 'in an inpatient 302 mental commitment program for two weeks[,]' [during which she] 'came across a lot of people who talked about being raped or sexually assaulted by family members[,]' [and she had] personally involved [herself] in . . . discussions concerning these sexual acts." *Id*. at 61. Giannopoulos further

- 25 -

claims that both S.B. and Z.H. were motivated to lie about the assault given their belief that he was wealthy and "could [thus] use these allegations to force [him] to buy them things." *Id*. at 62. Giannopoulos supports this contention with the fact that one of the girls' fathers had previously stolen $1,000.00 from him. Giannopoulos insists the record instead indicates that his testimony was credible, as he "had no motive to lie and none of his testimony was inconsistent." *Id*. Thus, Giannopoulos argues that this Court should find "that his conviction was against the weight of the evidence" and "award him a new trial." *Id*.

After reviewing Giannopoulos' weight of the evidence claim, the trial court determined that it was without merit, reasoning as follows:

> [Giannopoulos,] in . . . [his concise statement,] attacks the credibility of the witnesses, specifically indicating that the testimony of the victim and the eyewitness were contradictory and inconsistent.
>
> During trial, . . . S.B. testified regarding the sexual assault by [Giannopoulos]. Defense counsel cross-examined [her]. At the time of testimony, [S.B.] was [nineteen] years old, with the sexual assault having occurred when she was [twelve] years old. During trial, eyewitness, Z.H. testified[,] and defense counsel had the opportunity for cross[-]examination.
>
> The Commonwealth may sustain its burden by proving the crime's elements with evidence which is entirely circumstantial and the trier of fact, who determines credibility of witnesses and the weight to give evidence produced, is free to believe all, part, or none of the evidence. ***Commonwealth v. Jette***, 818 A.2d 533, 534 (Pa. Super 2003).
>
> In cases addressing sexually-based offenses, the uncorroborated testimony of the complainant, if believed by the finder of fact, is sufficient to warrant a conviction.

- 26 -

> ***Commonwealth v. Diaz***, 152 A.3d 1040, 1047 (Pa. Super. 2016)[.]
>
> This [c]ourt finds that the jury rendered verdicts in this matter[] which do not shock one[']s sense of justice, and the verdict was not contrary to the sufficiency of evidence admitted at trial. [Giannopoulos'] appeal is without merit.

Trial Court Opinion, 12/10/24, at 8-9 (citations omitted).

Based on our review, we discern no abuse of discretion by the trial court in denying Giannopoulos' challenge to the weight of the evidence. As explained above, this Court will give the gravest consideration to the findings and reasons advanced by the trial court judge when reviewing its determination as to whether the verdict is against the weight of the evidence. ***See Clay***, 64 A.3d at 1055. Moreover, one of the least assailable reasons for denying a new trial is the lower court's conviction that the verdict was not against the weight of the evidence. ***See id***.

Here, Giannopoulos is essentially asking this Court to reweigh the evidence to accord no weight to the testimony provided by either of S.B. or Z.H. at trial, which established that on the night of the incident, S.B. was twelve-years-old when Giannopoulos: (1) made her perform oral sex on him in his basement bedroom; and (2) forced her into having anal sex with him while she gripped the sheets of his bed in pain and cried into his pillows. This, we cannot do. ***See Talbert***, 129 A.3d at 545 (holding that the weight to be accorded to the evidence and testimony presented at trial was exclusively for the jury, which was free to believe all, part, or none of the evidence and

testimony and to determine credibility). Rather, this Court's role is to review the exercise of discretion by the trial court in ruling on the weight claim. In this regard, we discern no abuse of such discretion.

Importantly, we note that the trial court judge determined that Giannopoulos' guilty verdicts did not shock his conscience. As the trial court explained, these events occurred when S.B. was a child, at just twelve years old, whereas at the time of trial, she was a nineteen-year-old woman. Similarly, Z.H. was also a child when these events occurred, at thirteen years of age, whereas she was approximately twenty years old at the time of trial. The trial court further noted that both S.B. and Z.H. were cross-examined by defense counsel at trial, and the record reflects that such cross-examination was directed at the inconsistencies and contradictions in their testimony, particularly as to the versions of events that they related to police as children. Finally, as the trial court observed, the jury was free to believe all part or none of their testimony, despite the inconsistencies and contradictions, and the testimony of S.B. alone, even if uncorroborated, was sufficient to warrant a conviction if believed by the jury. *See* Trial Court Opinion, 12/10/24, at 8-9. For these reasons, we discern no abuse of discretion by the trial court in denying Giannopoulos' weight challenge, and we conclude that his third issue is without merit.

In his final issue, Giannopoulos argues that the evidence was insufficient to support the trial court's determination that he was an SVP. A challenge to

the sufficiency of the evidence presents a question of law for which our standard of review is *de novo*, and our scope of review is plenary. ***See Commonwealth v. Johnson***, 236 A.3d 1141, 1152 (Pa. Super. 2020) (*en banc*). As this Court has explained:

> In order to affirm an SVP designation, we, as a reviewing court, must be able to conclude that the fact-finder found clear and convincing evidence that the individual is an SVP. As with any sufficiency of the evidence claim, we view all evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth. We will reverse a trial court's determination of SVP status only if the Commonwealth has not presented clear and convincing evidence that each element of the statute has been satisfied.

***Commonwealth v. Hollingshead***, 111 A.3d 186, 189 (Pa. Super. 2015) (citation and brackets omitted).

As it relates to the procedural requirements underlying an SVP determination, our Court has elaborated as follows:

> The procedure for determining SVP status is statutorily mandated and well-defined. Under revised Subchapter H of SORNA, after a person has been convicted of an offense listed in [42 Pa.C.S.A. §] 9799.14, the trial court orders an assessment by the SOAB. The SOAB must assess all individuals convicted of sexually violent offenses to determine whether they should be classified as an SVP. When assessing whether a particular offender should be classified as an SVP, the board shall establish standards for evaluations and for evaluators conducting the assessments.

***Commonwealth v. Aumick***, 297 A.3d 770, 777 (Pa. Super. 2023) (*en banc*) (citations, quotation marks, and footnote omitted).

An assessment shall include, but not be limited to, an examination of the following:

(1) Facts of the current offense, including:

(i) Whether the offense involved multiple victims.

(ii) Whether the individual exceeded the means necessary to achieve the offense.

(iii) The nature of the sexual contact with the victim.

(iv) Relationship of the individual to the victim.

(v) Age of the victim.

(vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.

(vii) The mental capacity of the victim.

(2) Prior offense history, including:

(i) The individual's prior criminal record.

(ii) Whether the individual completed any prior sentences.

(iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

(i) Age of the individual.

(ii) Use of illegal drugs by the individual.

(iii) A mental illness, mental disability or mental abnormality.

(iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

42 Pa.C.S.A. § 9799.24(b)(1)-(4); *see also Aumick*, 297 A.3d at 777.

(citation omitted). "Whereas the SOAB member must consider the[se] fifteen

factors[,] the trial court must determine whether the Commonwealth has proven by clear and convincing evidence that the defendant is an individual who has 'a mental abnormality or personality disorder that makes [them] likely to engage in predatory sexually violent offenses.'" *Aumick*, 297 A.3d at778-79; *see also* 42 Pa.C.S.A. § 9799.12 (providing the definition of a "sexually violent predator").

Relevantly, a "SOAB expert opinion falls within the general rules regarding expert witnesses" and they may form their opinion with the assistance of "copies of records and information" provided by "all State, county and local agencies, offices and entities in this Commonwealth . . . as requested by the board in connection with the court-ordered assessment." *Aumick*, 297 A.3d at 778 (citations and brackets omitted); *see also* Pa.R.E. 702 ("Testimony by Expert Witnesses"); Pa.R.E. 703 ("Bases of an Expert's Opinion Testimony"). In accordance with this, if an "expert states an opinion[,] the expert must state the facts or data on which the opinion is based." Pa.R.E. 705.

Importantly, this Court has instructed that "[t]he statute governing the SVP assessment does not limit the expert's consideration of information only to that admitted at trial or at the guilty plea proceedings[,]" as their opinion "may be based on facts or data that the expert has been made aware of or personally observed so long as experts in [their] field reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Aumick*, 297 A.3d at 778 (citation omitted). Thus, "these facts or data consulted *need not*

***be admissible for the expert's opinion to be admitted***." ***Id***. at 778, 781. (citation omitted, emphasis added) (holding that "the facts presented at an SVP hearing" were not considered inadmissible hearsay as they were "not being offered for the truth of the matter, as would be the case in a true hearsay scenario[, but instead] constitute[d] information, gleaned from the records which are reasonably relied on in SOAB evaluations, that is presented to the trial court solely to supply the basis for the expert's opinion in accordance with our Rules of Evidence"). In coming to this determination, this Court stressed that, "in the context of an SVP hearing, the [trial court] judge is not tasked with evaluating the veracity of the facts underlying the expert's testimony" because "an SVP hearing is not a trial[,] and the primary purpose of the SVP registration requirements is to protect the public, not to punish the offender"). ***Id***.; ***see also Commonwealth v. Prendes***, 97 A.3d 337, 360 (Pa. Super. 2014).

Giannopoulos argues "[t]he evidence was insufficient for the trial court to make its SVP determination" as it based its determination entirely "upon the [opinion formed by the] Commonwealth's expert, [who relied] on the inadmissible and irrelevant web history data that occurred months after the alleged assault." Giannopoulos' Brief at 63. Giannopoulos contends that "SORNA II does not authorize an evaluator to substitute allegations for the 'facts of current offense,' especially when those allegations occurred months after the incident and had no nexus to the victim." ***Id***. at 66.

Giannopoulos points out that Dr. Dudley admitted that "the second report ha[d] a different conclusion from her initial report [only because of] the additional information that she reviewed concerning the web history data found on [his] phone." *Id*. at 67. Giannopoulos asserts that because this "data was the sole distinguishing factor used by Dr. Dudley to alter her opinion that [he] was an SVP[,]" and because "[n]othing in the SOAB statute allows or considers that an expert may rely on this irrelevant and inadmissible evidence[,]" the Commonwealth failed to establish that he met "the statutory definition of an SVP." *Id*. at 67-68.

Moreover, Giannopoulos argues that Dr. Dudley's reliance on this data was misplaced, as she "merely counted the overall number of web searches without any consideration if they were part of the same temporal instance" and had "occurred within seconds of each other[.]" *Id*. at 68. Additionally, Giannopoulos claims that although Dr. Dudley "conceded that not all 'force' used in sexual acts consists of 'sexual sadism force[,]'" he avers that her finding of such force here was improperly "based on looking solely for the word 'force' in the web searches and counting them[,]" even though she "did not know the level of force that was used based solely on the web searches." *Id*. Therefore, when Dr. Dudley changed her opinion and "testified that she was able to somehow perceive solely from the web browser history that" Giannopoulos had sexual sadism disorder, Giannopoulos contends that she impermissibly "assumed facts that were not in evidence and might not have been true." *Id*. at 69-70.

As an example of the above, Giannopoulos asserts that Dr. Dudley "reached her opinion because some search terms had words consisting of crying, pain[,] and rape, [which she] assumed . . . contained violent, hardcore[,] sadistic acts [even though she n]ever actually view[ed] the content of the search results." *Id*. at 70. Consequently, Giannopoulos maintains that because "the expert's conclusion was not based on the statutory requirement to consider the 'facts of the offense,' the evidence was insufficient to support [its] conclusion that [he] is an SVP." *Id*. at 71.

The trial court considered Giannopoulos' sufficiency claim and determined that it was without merit, reasoning as follows:

> Prior to sentencing, this court ordered a [PSI], psychiatric, and psychosexual evaluations. The court also directed that [Giannopoulos] be assessed by the . . . SOAB[] to determine if [he] met the legal criteria to be classified as a[n SVP.] Dr. . . . Dudley, . . . an SOAB board member and licensed psychologist submitted her findings to the court, noting a date of assessment of May 4, 2023, which initially concluded that [Giannopoulos] was not a[n SVP]; however, Dr. Dudley prepared an addendum, noting assessment dates of 5/4/23 and 5/12/23. In the cover letter, dated May 23, 2023[], the Executive Director of SOAB noted that the addendum was prepared after review of additional information provided by the District Attorney's office, and noting that Dr. Dudley now finds [Giannopoulos] a[n SVP]. More specifically, the addendum notes a mental abnormality personality disorder criteria noting [Giannopoulos] meets the four statutory criteria, including a "condition[,]"[] a paraphilic disorder of sexual sadism disorder, focused on the type of activities related to [Giannopoulos'] arousal, and in [Giannopoulos'] situation, that includes arousal from degradation and humiliation of women, as is noted from his internet browsing history and instances of his behavior in the instant offense, and other sexual offenses.
>
> Defense counsel submitted a psychosexual evaluation authored by Dr. . . . Haworth, [a] licensed psychologist,

- 34 -

specializing in clinical and forensic psychology noting interview dates of June 13, 2023 and July 21, 2023. Defense counsel also submitted psychosexual evaluation — SVP rebuttal 9/17/23, wherein Dr. H[a]w[o]rth opined that while [Giannopoulos] meets the predatory behavior requirement of SVP, . . . he does not suffer from the paraphilic disorder of sexual sadism disorder, and that as a result [Giannopoulos] does not meet the criteria for SVP. Dr. H[a]w[o]rth's report noted that [Giannopoulos] "demonstrated an Above Average risk for reoffense. Certainly, intervention for his mood and hypersexuality will greatly impact the risk" but rejects the notion that [Giannopoulos] "satisfies the diagnostic criteria for sexual sadism disorder[.]"

This court conducted a thorough review of all reports, rebuttal reports, evidence and testimony relating to [Giannopoulos'] status as a[n SVP] and did not err in determining [him] to be a[n SVP].

Trial Court Opinion, 12/10/24, at 12-13 (citations and unnecessary capitalization omitted).

After careful review, we determine the evidence was sufficient to support the trial court's finding that Giannopoulos is an SVP. Preliminarily, we note that Giannopoulos **stipulated** to the admissibility of the Web Browsing History Report, and to the authenticity of the dated web searches reflected therein. Giannopoulos also **admitted** at trial that he had, in fact, made those searches. Thus, Giannopoulos' claim that such evidence and testimony was "inadmissible" at trial is simply meritless.

As it pertains to the undated searches in the Web Browsing history Report relied on by Dr. Dudley in forming her amended SVP opinion, we similarly conclude that Giannopoulos' sufficiency claim is meritless. As explained above, there was no requirement that Dr. Dudley limit the formation of her opinion to evidence actually admitted at trial. **See Aumick**, 297 A.3d

- 35 -

at 778. Instead, a SOAB member may form their opinion with the assistance of "copies of records and information" provided by "all State, county and local agencies, offices and entities in this Commonwealth . . . as requested by the board in connection with the court-ordered assessment." **Aumick**, 297 A.3d at 778. Here, as the Web Browsing History Report was prepared by investigating police officers, Dr. Dudley was permitted to review all aspects of the report, including the undated searches that were excluded from evidence at trial, so long as individuals in her field would reasonably rely on such information in the formation of their own expert opinions. **See id**.; **see also** Pa.R.E. 702, 703, 705.

Notably, Giannopoulos does contend that the undated searches in the Web Browsing History Report are not of the type of information that other SVP evaluators would reasonably rely on in forming their SVP expert opinions. Indeed, Giannopoulos' own SVP expert, Dr. Haworth, plainly considered the entirety of the Web Browsing History Report and incorporated the search results into his own professional analysis to dispute Dr. Dudley's results and instead opine that Giannopoulos did not meet the statutory SVP criteria. **See** N.T., 9/21/23, at 91, 103-05, 111, 119, 124-25, 130-31, 134-35, 155, 157.

Finally, we address Giannopoulos' argument that the evidence was insufficient to support the trial court's determination that he is an SVP because Dr. Dudley "merely counted the overall number of web searches" in the web Browsing History Report without considering how close together or far away in time the searches were made. **See** Giannopoulos' Brief at 68. The record

reflects that Dr. Dudley's review of this report revealed to her **multiple**, **distinct** instances where Giannopoulos searched for pornography depicting people experiencing pain while being forced to have sex. These searches, which are partially reproduced above, included search terms and descriptors of anal sex, forced sex, women crying, and or helplessness. Dr. Dudley's assessment of these terms clearly evidences that her analysis was not limited to merely counting the **number** of pornographic searches that Giannopoulos made, but rather reflects her consideration of the **nature** of those searches which were made over several months.

In Dr. Dudley's opinion, these search terms revealed that Giannopoulos was searching for people who were experiencing pain while being forced to have sex, and that he was aroused by physical and psychological humiliation, physical pain, and physical degradation, which is a component of sexual sadism – a paraphilic disorder. **See** N.T., 9/21/23, at 13. Dr. Dudley further testified that Giannopoulos' condition of sexual sadism was a lifetime condition that would predispose him to an increased likelihood of reoffending. **See id**. at 19. Such testimony, as credited by the trial court, was sufficient to support the court's determination that Giannopoulos met the SVP criteria because he suffers from a mental abnormality and personality disorder that makes him likely to engage in predatory sexual offenses. **See id**. at 204. Thus, for the reasons explained above, we hold Giannopoulos' final issue is without merit.

Consequently, because we determine that each of Giannopoulos' issues are either waived or without merit, we affirm the judgment of sentence and the trial court's determination that he is an SVP.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/17/2025